PASQUALE GUERCIO and LYDIA GUERCIO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Guercio v. Commissioner
Docket No. 4073-80.
United States Tax Court
T.C. Memo 1982-28; 1982 Tax Ct. Memo LEXIS 717; 43 T.C.M. (CCH) 336; T.C.M. (RIA) 82028; January 20, 1982. Arthur N. Nasser, for the petitioners. Judith M. Picken, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined a deficiency in the amount of $ 16,555 in petitioners' income tax for 1977, together with an addition to tax in the amount of $ 828 under section 6653(a). *718 [1] The principal issue for decision is the amount of petitioners' wagering income, if any, in 1977. Also for decision is whether petitioners' underpayment of tax, if any, was due to negligence or intentional disregard of the rules and regulations within the meaning of section 6653(a). [1]
FINDINGS OF FACT At the time their petition was filed, petitioners Pasquale Guercio and Lydia Guercio, husband and wife, were legal residents of Illinois and resided at 371 Cardinal Drive in Bloomingdale. Petitioners timely filed their joint Federal income tax return for 1977 with the Internal Revenue Service Center, Kansas City, Missouri, to which they attached a Schedule C for a wagering business. In the schedule, it was stated that the business was on a cash method of accounting. The schedule showed total income in the amount of $ 238,287; business expenses consisting of taxes on wagering of $ 4,857 and "prizes and commissions and other expenses" of $ 214,267, a total of $ 219,224; and a net profit of $ 19,063. The Schedule C shows the address *719 of the business as 371 Cardinal Drive and in response to a question "How many months in 1977 did you own this business?" answers "01 month." During 1977 petitioner Pasquale Guercio (hereinafter petitioner) owned a janitorial service in Elmwood Park, Illinois, which he operated under the name of Pat Guercio Maintenance Service. In addition, he worked as a barber and hair stylist at the Georgetown West Barber Shop which he operated in partnership with others and which was located at 448 Georgetown Square, Wooddale, Illinois. On April 21, 1977, Chicago police officers conducted surveillance at 2016 North Kilborn Avenue in Chicago, which was the residence of Jose Suarez (Suarez), an acquaintance of petitioner. During the surveillance, Lieutenant Dominic Rizzi observed a man later identified as petitioner enter the premises and leave with Suarez. They made several stops and later returned to the North Kilborn address. On April 26, 1977, and May 3, 1977, Chicago police conducted surveillance at 371 Cardinal Drive in Bloomingdale. Surveillance was conducted on those dates because they were Tuesdays preceding the Wednesday drawings for the Puerto Rican National Lottery. On the basis *720 of the investigation of petitioner and Suarez, including the surveillance on April 21 and 26 and May 3, 1977, the Chicago police obtained a search warrant for 371 Cardinal Drive. At approximately 1:20 a.m. on May 11, 1977, which was a Wednesday, Chicago police officers, working with the Bloomingdale police and a member of the Illinois Department of Law Enforcement, conducted a search of petitioner's residence at 371 Cardinal Drive in Bloomingdale and pursuant to the search warrant seized records of Bolita wagers. No Federal law enforcement officers were involved in the search. Present at petitioner's residence during the search were petitioner, Suarez, Efrain Medina, two women, and a child. A copying machine was found in petitioner's house, and it was being used to make duplicates of the Bolita wagering records. In addition to records on Bolita wagers, the police conducting the search seized calculators, a copying machine, and currency. Some of the Bolita records were dated, but others were not. Bolita is a numbers game with a weekly drawing based upon the last three digits of the grand prize-winning number in the Puerto Rican National Lottery. The drawing for the lottery *721 is held each Wednesday morning in Puerto Rico. Chicago-style Bolita involves a variety of wagers placed on numbers ranging from 000 to 999: a "straight bet" which pays 500 to 1 on the exact number; an "approximation bet" which pays 400 to 1 on the exact number and 25 to 1 on two numbers up and two numbers down from the number bet; and a "combination bet" which pays varying amounts on combinations of the three digits bet. The number which determines whether the bettor wins is composed of the last three digits of the number of the winning ticket in the Puerto Rican National Lottery. In a typical Bolita operation an individual bettor places a bet with a "writer" by telling the writer the 3-digit number he or she wishes to bet on, the amount of the bet, and the type of the bet. The writer records the bet on a bet list which reflects the type of bet and collects the amount of the bet from the bettor. Sometime before the Wednesday morning drawing in Puerto Rico, the writer passes his bet list on to a pickup man or agent, who in turn passes the bet list on to the owner, or banker, of the Bolita operation. The winners are then determined by the Puerto Rican National Lottery drawing early *722 Wednesday of each week. The writer holds the money collected from bettors until late Wednesday or Thursday after the drawing when it is picked up by the agent or pickup man, except that the writer retains 35 percent as his commission or discounts the bettor's payment by 35 percent and shares in any winnings. The commission paid to an agent or pickup man varies depending on the deal the agent is able to negotiate. It is ordinarily 5 to 10 percent of the gross amount wagered by the bettor. Petitioner maintained no permanent records of his wagering receipts or expenses. He filed a Form 730, Tax on Wagering, for the month of April 1977 showing gross wagers accepted during the month in the amount of $ 79,429.05. He filed a Form 730, Tax on Wagering, for the month of May 1977 showing gross wagers accepted during the month in the amount of $ 158,858. On August 29, 1978, he paid wagering excise taxes, penalties, and interest in the amount of $ 5,838.03. Petitioner also signed and filed with the Internal Revenue Service a Form 11-C, Special Tax Return and Application for Registry--Wagering, for the period April 1, 1977 to June 30, 1977; on this form petitioner was designated as owner *723 of the Bolita operation. These forms were prepared by an Internal Revenue Agent and signed on the advice of petitioner's attorney, Michael Unger. The records of Bolita wagers seized by the Chicago police were turned over to agents of the Internal Revenue Service in accordance with a standing arrangement. Revenue Agent David Walker (Walker) prepared a worksheet showing that the total amount bet for a oneweek period, as reflected by the records, was $ 79,429. Based on his conclusion that petitioner had maintained the Bolita operation for 3 weeks, he multiplied that figure by 3 and determined gross wagering income of $ 238,287. Walker used these figures in preparing the above-described Forms 730 and 11-C. In the records which Walker used, there were duplications of certain figures which resulted in an overstatement of gross gambling receipts by $ 26,921. For the week covered by the records, gross wagering receipts were $ 52,508 rather than $ 79,429. The gross wagering receipts for the 3-week period in which petitioner was engaged in the Bolita operation should, therefore, have been $ 157,524. Petitioners' Federal income tax return for 1977 was prepared by Barry Swartz (Swartz), *724 C.P.A. In preparing the return, Swartz did not review the Bolita gambling records, but in the Schedule C covering the Bolita operations he inserted the figure $ 238,287 in reporting gross receipts because attorney Michael Unger gave it to him and it was the figure reported for gambling excise tax purposes. Swartz was not aware that the $ 238,287 figure reflected the duplications referred to above. He computed the deduction of $ 214,367 for prizes, commissions, and other expenses on the basis of petitioner's estimate that he made a profit of about 8 percent. Given this profit ratio, Swartz "backed into" the net expenses. Swartz made no independent investigation to verify the 8-percent profit figure. Deducting the net expenses so determined and the $ 4,857 in wagering excise taxes, penalties, and interest paid in 1978, Swartz arrived at a net profit of $ 19,063. In the notice of deficiency, respondent reduced the deduction of $ 214,367 shown in petitioners' 1977 return as prizes, commissions, and other expenses by $ 47,566, allowing a deduction of 70 percent of gross receipts, an amount of $ 166,801, on the ground that a greater amount had not been established. In the notice *725 of deficiency respondent also disallowed the $ 4,857 deduction for excise taxes and related amounts on the ground that it had not been established that these amounts were ordinary and necessary expenses or were expended for the purposes designated. OPINION Petitioner attacks respondent's deficiency determination on several grounds. First, he argues that petitioner did not own or carry on the Bolitz operation. Second, he contends that, if petitioner is chargeable with income from the operation, the profit determined by respondent is excessive in that petitioner did not carry on the operation for as long as 3 weeks. Third, he maintains that respondent erred in determining the deductible amount of the commissions, expenses, and prizes. Finally, relying upon Weimerskirch v. Commissioner, 596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977) and Jackson v. Commissioner, 73 T.C. 394 (1979), he argues that there is no rational foundation for respondent's determination and, therefore, the evidence should be weighed by placing the burden of proof on respondent. We hold that petitioner is entitled to the benefit of the stipulated *726 error in the determination of the amount of petitioner's Bolita gambling income. His deduction for commissions, expenses, and prizes is to be adjusted proportionately. We find no merit in petitioner's other contentions. 1. Ownership of the Bolita Operation
The evidence simply will not support a finding that petitioner did not own or was not engaged in a Bolita operation for 3 weeks in April and May 1977 or that the income derived from the operation did not belong to him. The Chicago police, in conducting a search of petitioner's home, found the Bolita records on which the entire case is based. Not only were the records in petitioner's home, the police also found the paraphernalia--copying machine, calculators, and currency-needed for the conduct of the operation. The copying machine was being used, and an original record was in the machine. Petitioner testified as a witness but offered no explanation as to why the records and equipment were in his home if he did not own the operation. Moreover, petitioner signed and filed a Form 11-C, Special Tax Return and Application for Registry--Wagering, for the period April 1, 1977 to June 30, 1977, showing his address as 371 *727 Cardinal Drive in Bloomingdale and designating himself as "owner." He filed two Forms 730, Tax on Wagering, one for April 1977, showing gross wagers of $ 79,429.05, and another for May 1977, showing gross wagers of $ 158,858. Further, he signed and filed his 1977 Federal income tax return with which he included a Schedule C containing the same gross wagering figures as appear in the Forms 730. Although not conclusive, these documents constitute admissions that he owned the Bolita business, an acknowledgment that the records related to the one-week period ended May 11, 1977, and a concession that the operations spanned 3 weeks. Waring v. Commissioner, 412 F.2d 800, 801 (3d Cir. 1969), affg. a Memorandum Opinion of this Court. Petitioner argues that these returns should be disregarded. He maintains that he was misled and "cruelly deceived" by an incompetent attorney who advised him to sign the Form 11-C and Forms 730 and flee the country to avoid criminal prosecution, when, in fact, no criminal case against him was pending. His accountant then advised him to file his 1977 income tax return consistent with those forms to avoid involvement with the Internal Revenue *728 Service. It is true that Lieutenant Rizzi testified that petitioner was charged with syndicated gambling, keeping of gambling records, and keeping a gambling place, and that he "was informed by the State's Attorney's Office and Page County that the [search] warrant [he had obtained] was quashed" and the criminal proceedings against petitioner were dropped. But the record does not show whether the termination of the criminal action against petitioner followed or preceded the filing of the Form 11-C and the Forms 730. Furthermore, the attorney who advised petitioner to file the forms was not called as a witness and no other effort was made to show the facts or evidence on which he based his advice to petitioner. Petitioner testified that he did not have gross receipts of $ 238,287 from wagering and that he did not realize a net profit of $ 19,063 from the operations. He testified that he reported those figures in his returns only because his attorney, Michael Unger, told him to do so. Significantly, however, petitioner at least implicitly admitted that he had some taxable income from Bolita in 1977 and did not deny that he owned the Bolita operations conducted in his home. *729 His only explanation of his execution of the Form 11-C designating himself as owner of the operation was that he signed the form on the advice of his attorney. Again, there is no evidence before the Court as to the facts or law on which Unger based his advice. 2. Period of Petitioner's Bolita Operations
The determined deficiency was based on respondent's conclusion that petitioner was engaged in the Bolita operation for the 3-week period ended Wednesday, May 11, 1977. As noted above, the Schedule C attached to petitioner's return for 1977 shows that he was in the business for one month.The Forms 730 report excise tax liability on $ 79,429,05 for April 1977 and on exactly twice that amount, $ 158,858, for May 1977. As suggested above, these returns are admissions by petitioner from which the clear implication is that he operated the gambling operation for 3 weeks. Waring v. Commissioner, supra at 801. Significantly, also, petitioner did not expressly deny that he was engaged in the gambling operations during this 3-week period. Petitioner emphasizes that, of the records seized on May 11, 1977, the lists with respect to wagers of only $ 22,499 are *730 dated. He argues that the undated records did not necessarily relate to the week of May 11, 1977. On this ground, he argues that respondent erred in his projection of wagers for the 3-week period. Again, we note that the Forms 730 and petitioner's income tax return project the total amount of the betting slips on hand (as computed at that time) over the 3-week period.Moreover, the police search was carefully timed for early Wednesday, May 11, 1977, shortly before the drawing for the national lottery in Puerto Rico, so that the betting slips from the writers and agents would be on hand. It is unlikely that petitioner, at a time when some of the records were being copied, would have mixed the May 11 records with records of another week. In addition, the testimony showed that operators of a numbers gambling establishment dispose of their slips as soon as practicable so that they will not be available in case of police action. Subject to the stipulated correction to eliminate duplications, petitioner has not shown that the seized records did not relate to the week ended May 11, 1977, or that the projection of the amount of the bets listed for that week over the 3-week period produced *731 erroneous results. 3. Deductible Amount of Commissions, Expenses and Prizes, and Excise Taxes
Petitioner had no records on the amount of his expenses, including commissions and prizes. As explained in our findings, petitioner estimated his profits at 8 percent of the gross wagers and beginning with that estimate the accountant "backed into" the deduction of $ 214,367 from the reported gross wagers of $ 238,287. Respondent allowed a deduction of $ 166,801--70 percent of gross receipts. In making this determination, respondent allowed expenses consisting of writers' commissions (35 percent of gross receipts), commissions paid to agents (5 percent of gross receipts), and payouts for wins (30 percent of gross receipts). The knowledgeable witnesses agree that the writers of bets customarily received 35 percent, e.g., 70 cents out of a $ 2 bet. The agents or pickup men are freelance operators and they receive a negotiated price for their services. Lieutenant Rizzi testified that they receive between 5 and 10 percent of the gross wagers. Some of the seized records contain computations of the agents' commissions, and the commissions shown on those records approximate 5.2 percent. *732 As to the amount paid out as prizes, from the seized records it appears that most of the bets were approximation bets which, as stated in our findings, paid 400 to 1 for the exact number and 25 to 1 for two numbers up and two numbers down from the exact number. Respondent on brief has calculated the win ratio for the exact number at 40 percent (1/1,000 x 400/1 = 400/1,000 = 2/5 = 40 percent), and for the four numbers above or below the win number at 10 percent (1/250 X 25/1 = 25/250 = 1/10 = 10 percent). While the record contains no analysis of the actual win ratio in respect of petitioner's operations, respondent's computations appear to be reasonable. In the light of all the testimony and, particularly, petitioners' admission [2] that his 8-percent profit figure was merely an approximation, we conclude that respondent's determination must be sustained. Petitioner has not shown that respondent's 70-percent formula is erroneous. In recomputing the deficiency to reflect the elimination of the duplications of betting lists that occurred in calculating gross wagering receipts, the 70 percent should, of course, be applied to the revised receipts figure. *733 Although the Schedule C attached to petitioners' 1977 income tax return states that the Bolita wagering business reported on the cash basis, petitioner deducted for 1977 as an accrued expense the excise taxes which he paid on August 29, 1978. Where a taxpayer has not regularly used a particular method of accounting, under section 446(b), the computation of taxable income must be made in accordance with a method which, in the opinion of the Secretary, clearly reflects income. Respondent's determination that petitioner must use the cash method of accounting was an exercise of the authority granted by section 446(b). A taxpayer who keeps no books or records of account may not claim respondent has abused his discretion by placing him on the cash basis. Gajewski v. Commissioner, 67 T.C. 181, 197 (1976), affd. per order (8th Cir., May 2, 1978); England v. Commissioner, 34 T.C. 617, 620 (1960). We conclude, therefore, that respondent's disallowance of the wagering excise deduction for 1977 must be sustained. 4. Burden of Proof
Citing such cases as *734 Weimerskirch v. Commissioner, 596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977); Caron v. United States, 560 F.2d 693, 696-698 (5th Cir. 1977); Jackson v. Commissioner, 73 T.C. 394 (1979), petitioner argues that respondent should be saddled with the burden of proof as to the correctness of the determined deficiency. We disagree. The cases on which petitioner relies involved what the courts referred to as "naked" assessments.The Commissioner in those cases offered no evidence linking the taxpayer to such illegal activities as drug dealing and did not attempt to substantiate the charge of unreported income by any other means. Because there was no evidentiary foundation linking the taxpayer to the alleged, illegal income-producing activity, the courts weighed the evidence on the basis of placing the burden of proof on the Commissioner. In the instant case, the Forms 11-C and 730, as well as the 1977 income tax return, were all signed and filed by petitioner. In those documents, he admitted the receipt of gross wagering income in exactly the amount set forth in the notice of deficiency. These documents were *735 all prepared with the assistance of an attorney or accountant of petitioner's choice. Further the search by the Chicago police uncovered betting lists in petitioner's possession. Indeed, petitioner testified as to how he arrived at the percentage of gross wagers on which he based his estimates of the deducted expenses. There is no ground for holding that respondent's determinations were arbitrary and excessive. 5. Addition to Tax
We are compelled to sustain the determination as to the section 6653(a) addition to tax. Petitioner maintained no permanent records on his Bolita operation. Although a gambling establishment would run practical risks of detection and prosecution by keeping records on its activities, section 6653(a)[3] contains no provision exempting operators of illegal businesses from the requirement of keeping books of account of records sufficient to permit the verification of their returns. Sec. 7602; sec. 1.6001-1, Income Tax Regs. Petitioner has not shown that the underpayment of tax was not due to negligence or intentional disregard *736 of the rules and regulations. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.↩
2. Petitioner testified: Q. * * * how did you determine, Mr. Guercio, the amounts of expenses incurred in 1977 relating to your Bolita wagering * * * operation? A. Well, I did ask around, but I didn't have no idea whatsoever, and they told me that--I talked to Mr. Suarez and Mr. Medina--and said approximately 8 to 10 percent. That would be the profit, made on this particular, on $ 238,000.↩
3. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes.-- If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A * * * is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.↩